UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
In re:

ORGANIC AVENUE LLC,

Debtor.
--------------------------------------------------------------------X

Chapter 7

Case No. 15-12787 (REG)

**ORDER, PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008 AND 9014, APPROVING SALE OF ESTATE'S ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF THE ESTATE'S NON-RESIDENTIAL REAL PROPERTY LEASES FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND GRANTING RELATED RELIEF**

Upon the *Chapter 7 Trustee's Motion, Pursuant to 11 U.S.C. §§ 105, 363 and 365 and Rules 2002, 4001, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure, Seeking Entry Of Orders: (I) Approving (A) Bid Procedures, (B) Notice Of Sale, Auctions and Sale Hearing, (C) Scheduling Auctions and Sale Hearing; and (D) Assumption Procedures and Related Notices; and (II) Approving the Sale of the Estate's Assets Free and Clear of All Liens, Claims and Encumbrances and Granting Related Relief* [Dkt. No. 24] (the "**Motion**"), of Jil Mazer-Marino, the chapter 7 trustee (the "**Trustee**") of the chapter 7 bankruptcy estate of Organic Avenue, LLC, the above-captioned debtor (the "**Debtor**"); and the Motion having sought entry, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), of (I) an order, among other things, (A) approving bid procedures (the "**Bid Procedures**") in connection with the Trustee's proposed sale (the "**Sale**") of the estate's right, title, and interest in substantially all of the Debtor's assets, and (B) scheduling an on-line auction (the "**On-Line Auction**") and a live-auction (the "**Live Auction**" and together with the On-Line Auction, the "**Auctions**") and a sale hearing (the "**Sale**

**Hearing**") and approving the form and manner of notice thereof; and (II) an order (A) approving the Trustee's sale of the Estate's right, title and interest in the Assets to the bidder submitting the highest and best bid free and clear of liens, claims, encumbrances and interests; and (B) granting related relief; and upon the Court's consideration of the Motion, the record of the hearing held on November 3, 2015 with respect to the Motion (the "**Bid Procedures Hearing**"); and good and sufficient notice of the Motion and the Bid Procedures Hearing having been given and no other or further notice of the Motion or the Bid Procedures Hearing being required; and upon the *Order, Pursuant to 11 U.S.C. §§ 105, 363 and 365 and Rules 2002, 4001, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure Seeking Entry of Orders: (I) Approving (A) Bid Procedures, (B) Notice Of Sale, Auctions and Sale Hearing, (C) Scheduling Auctions and Sale Hearing, and (D) Assumption Procedures and Related Notices; and (II) Approving the Sale of the Estate's Assets Free and Clear of All Liens, Claims and Encumbrances and Granting Related Relief* [Docket No. 40], entered on November 5, 2015 (the "**Bid Procedures Order**"); and upon the *Order Authorizing the Trustee to Designate Arrow Equity Fund LLC as Stalking Horse Bidder and Approving Break-Up Fee and Bid Protections*, entered November 17, 2015 [Dkt. No. 84], that, among other things, authorized the Trustee to designate Arrow Equity Fund LLC as the stalking horse bidder for the Live Auction; and the Auctions having been conducted and completed by the Trustee and her professionals on November 20, 2015 pursuant to the Bid Procedures; and upon all of the proceedings had before the Court; and after due deliberation, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT

A.      The Court has jurisdiction over the Motion, this matter and over the property of the Debtor's estate pursuant to 28 U.S.C. §§ 157(a) and 1334, including the Subsidiary Assumed Leases , the Cure Amounts (each as defined below) related thereto and the transactions with respect thereto.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). The statutory predicates for the relief sought herein are Bankruptcy Code sections 105, 363 and 365 and Bankruptcy Rule 2002, 4001, 6004, 6006, 9008, and 9014. Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The notice of the Motion, the Bid Procedures Hearing, the Bid Procedures Order, the Bid Procedures, the Auctions, and the Sale Hearing, given by the Trustee constitutes due and sufficient notice thereof.

C.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

D.      The Auctions were duly noticed and conducted in a non-collusive, fair and good faith manner in accordance with the Bid Procedures Order.

E.      Potential bidders had a full, fair and reasonable opportunity to conduct due diligence and submit bids and the Trustee considered any and all bids that were Qualified Bids (as defined in the Bid Procedures) for all or any part of the Debtor's estate's assets, including all of the Debtor's estate's right, title and interest in and to:  (i) certain trademarks, tradenames, customer lists, recipes and other intellectual property (the "**IP Assets**"); (ii) certain furniture, machinery and equipment (the "**M&E Assets**"); and (iii) certain leases for non-residential real property.

3

F.      The Trustee conducted the Auction in accordance with, and has otherwise complied with, the Bid Procedures Order.  The Trustee's marketing of the Debtor's estate's assets was reasonable and appropriate considering the facts and circumstances of this chapter 7 case and the nature of the Debtor's assets.

G.      At the conclusion of the Auctions, the Trustee determined that Arrow Equity Fund LLC's (the "**Buyer**") bid for substantially all of the Debtor's estate's assets pursuant to the terms of the Asset Purchase Agreement that is annexed hereto as Exhibit "A" (the "**APA**") constituted the highest or otherwise best offer received for the Acquired Assets (as such term is defined in the APA) and designated the Buyer as the Successful Bidder as such term is defined in the Bid Procedures.  The Buyer may, in its reasonable discretion, designate one or more entities that shall be the assignee under one or more Assumed Leases (hereinafter, collectively the "**Designee**")

H.      At the conclusion of the Auctions, the Trustee also determined that the bids submitted by the following bidders constituted the second highest or otherwise best offers for certain of the Debtor's estate's assets and designated them as Back-Up Bidders as such term is defined in the Bid Procedures: (i) Miras Capital LLC was the Back-Up Bidder for the IP Assets; (ii) Emil Capital Partners LLC was the Back-Up Bidder for the premises located at 254 Park Avenue South, New York, New York, 1065 Avenue of the Americas, New York, New York, and 461 Amsterdam Avenue, New York, New York and the M&E Assets located at the three aforementioned premises; (iii) Angelic Foods, Inc. was the Back-Up Bidder for premises located at 649 Lexington Avenue, New York, New York and the M&E Assets located at such premises; (iv) The JuicePress, Inc. was the Back-Up Bidder for premises located at 640

Broadway, New York, New York; and (v) the individual bidders at the On-Line Auction are the Back-Up Bidders for the remaining M&E Assets.

I.       The Trustee's determination that Buyer's offer, as memorialized in the APA, constitutes the highest or otherwise best offer for the Acquired Assets and that the Back-Up Bidders' offers for certain of the Debtor's estate's assets constitute the second highest or otherwise best offers for such assets is a valid and sound exercise of the Trustee's business judgment.

J.       Good and sufficient reasons for approval of the Sale of the Acquired Assets to Buyer under the terms of the APA have been articulated, and the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest.

K.       The negotiation of the Sale of the Acquired Assets to Buyer was the product of arm's-length, good-faith negotiations.  The APA was negotiated, proposed and entered into by and between the Trustee and Buyer without collusion and from arm's-length bargaining positions.

L.       The consideration payable to the Debtor's estate by Buyer for the Acquired Assets was not controlled by any agreement between Buyer and/or any other potential bidders for the assets and Buyer has not acted in a collusive manner with any person in violation of Bankruptcy Code section 363(n) and neither the Trustee nor Buyer engaged in any conduct that would cause or permit the sale of the Acquired Assets to be avoided under Bankruptcy Code section 363(n).

M.       The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to the full protection of that provision.

N.      The Debtor is the tenant under certain non-residential real property leases to be assumed and assigned to Buyer under the APA, which leases are for premises commonly known as: (i) 206 East 86th Street, New York, New York; (ii) 10-01 45th Road, Long Island City, New York; (iii) 43-46 10th Street, Long Island City, New York; (iv) 43-37 9th Street, Long Island City, New York; and, (v) 43-43 9th Street, Long Island City, New York (the "**Debtor Assumed Leases**").

O.      The Debtor's wholly owned limited liability companies (collectively, the "**Subsidiaries**") are the tenants under certain non-residential real property leases to be assigned to the Buyer under the APA (the "**Subsidiary Assumed Leases**" and together with the Debtor Assumed Leases, the "**Assumed Leases"**).  Each Subsidiary and the common address for the property it leases under the Subsidiary Assumed Leases are as follows:  (i) OA 254 Park Avenue South LLC is the tenant under a lease for property located at 254 Park Avenue South, New York, New York; (ii) Organic Avenue 640 LLC is the tenant under a lease for property located at 640 Broadway, New York, New York; (iii) Organic Chelsea, LLC is the tenant under a lease for property located at 261 West 21st Street, New York, New York; (iv) Organic Avenue WV LLC is the tenant under a lease for property located at 515 Hudson Street, New York, New York; (v) OA 1065 Avenue of the Americas LLC is the tenant under a lease for premises located at 5 Bryant Park a/k/a 1065 Avenue of the Americas, New York, New York; (vi) Organic Avenue 82 LLC is the tenant under a lease for premises located at 461 Amsterdam Avenue, New York, New York; and, (vii) Organic Avenue 55 LLC is the tenant under a lease for premises located at 649 Lexington Avenue, New York, New York.

P.      Based on the affirmative consent and/or the lack of objection on the record of the Sale Hearing by the Lease Counterparties, the Assumed Leases are or will be in full force

and effect as of the Closing and upon the payment of the Cure Amount, the replenishment of the security deposit, and the payment of the additional security deposit as agreed to by the Buyer and the applicable Lease Counterparty.

Q.      Except as otherwise specifically provided in this Order, or as specifically agreed to with the respective lease counterparty for an Assumed Lease (each, a "**Lease Counterparty**"), the monetary defaults that exist or will exist as of November 30, 2015 (the anticipated date of the Closing as such term is defined in the APA) under the Assumed Leases are fixed in the sums set forth on Exhibit "B" hereto (the "**Cure Amounts**").  No monetary or non-monetary defaults exist in the Debtor's or the Subsidiaries' performance under the Assumed Leases as of the date of this Order (provided the Closing occurs on or before November 30, 2015) other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in Bankruptcy Code section 365(b)(1)(A) or are not required to be cured pursuant to agreement among the applicable Lease Counterparty, the Trustee and the Buyer.  Upon payment of the Cure Amounts, each Lease Counterparty shall be barred from asserting any additional Cure Amounts or other claims with respect to its Assumed Lease against the Debtor's estate or any Subsidiary.  Notwithstanding the foregoing, the Lease Counterparties shall be permitted to assert a claim of up to $2,000.00 per Assumed Lease against the Buyer or its Designees for unbilled charges that accrue prior to the Closing so long as the Lease Counterparty provides reasonable evidence of such charges to the Buyer.

R.      Pursuant to the APA, the Debtor's estate is obligated to pay the Cure Amounts to effectuate the assignment of the Assumed Leases to the Buyer.  The use of the Debtor's estate's assets to pay the Cure Amounts is in the best interests of the Debtor's estate

and creditors because it enables the Trustee to maximize the value of the Debtor Assumed Leases and to realize the substantial value of the Subsidiary Assumed Leases.

S.      Buyer agrees to assume the non-monetary cure obligations set forth in the *Objection of Schuman 43-46 10th Street LLC and Schuman 43-50 10th Street LLC to Debtor's Cure Amount for Non-Residential Real Property Lease* [Dkt No. 64].

T.      To the extent the proceeds of the Sale are impressed with a trust pursuant to the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("**PACA**"), the Cure Amounts and security deposits shall be paid irrespective of such trust in accordance with the *Order Fixing The Administrative Expenses To Be Paid From Proceeds From The Sale Of PACA Trust Assets*, entered on November 17, 2015 [Dkt. No. 85] (the "**PACA Order**"), and the beneficiaries of the PACA trust have no interest in such Cure Amounts or security deposits.

U.      Pursuant to the APA, the Buyer is obligated to replace any security deposit set forth in an Assumed Lease and the additional security amounts set forth on the record of the Sale Hearing (the "**Additional Security**") at the Closing.  The Lease Counterparties to the Assumed Leases are holding security deposits under the Assumed Leases in the amounts set forth on Exhibit "B" hereto and such security deposits are property of the Debtor's estate.

V.      The Trustee has met all requirements of Bankruptcy Code section 365(b) for each Debtor Assumed Lease.  Respecting each Debtor Assumed Lease, the Trustee or Buyer has, as provided herein:  (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing, within the meaning of Bankruptcy Code section 365(b)(1)(A); (ii) provided compensation or adequate assurance of compensation for actual pecuniary loss to such Lease Counterparty resulting from a default prior to the Closing, within the meaning of

8

Bankruptcy Code section 365(b)(1)(B); and (iii) provided other adequate assurance of future performance as set forth on the record of the Sale Hearing.

W.    The Buyer has demonstrated adequate assurance of its future performance under the Debtor Assumed Leases within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).  Pursuant to Bankruptcy Code section 365(f), the Debtor Assumed Leases to be assumed and assigned to Buyer shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

X.    The Trustee, on behalf of the estate, had, has, and is hereby granted, (i) full corporate power and authority to execute and deliver the APA and all other documents and instruments contemplated thereby, (ii) all of the corporate power and authority necessary to consummate the Sale; and (iii) is authorized to pay the Cure Amounts as necessary to cure monetary defaults under the Assumed Leases.  No other or further consents or approvals are required to consummate the Sale or the assumption or assignment of the Debtor Assumed Leases.

Y.    Each Subsidiary is a limited liability company organized under the laws of the State of New York.  The Debtor is the sole member of each Subsidiary.  The Trustee, as chapter 7 Trustee of the Debtor and the sole person authorized to take action on behalf of the Debtor or with respect to the Debtor's property, has full corporate power and authority to execute resolutions, assignment agreements, and such other documents and instruments that authorize each Subsidiary to assign its interests in its respective Subsidiary Assumed Lease to the Buyer or its Designee.  The Lease Counterparties to the Subsidiary Assumed Leases have consented to the assignment and assumption by Buyer or its Designee, and no other or further consents or

9

approvals are required to consummate the assignment of the Subsidiary Assumed Leases or for the Buyer or its Designee to assume the Subsidiary Assumed Lease.

Z.    No section of any Assumed Lease which purports to prohibit, restrict, or condition the use, consideration or assignment of any such Assumed Lease in connection with the Sale to the Buyer under the APA shall have any force or effect.

AA.    The transfer of the Acquired Assets hereunder will be a legal, valid, and effective transfer of the Acquired Assets and will vest the Buyer with all right, title, and interest of the estate to the Acquired Assets free and clear of all liens, claims, encumbrances, obligations, liabilities or interests of any kind or nature whatsoever, if any (collectively, the "**Interests**").

BB.    The Trustee may sell the Acquired Assets free and clear of any Interests of any kind or nature because at least one of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been otherwise satisfied with respect to each such Acquired Asset.  Any and all holders of Interests who did not object are deemed to have consented to the sale, free and clear of Interests, pursuant to Bankruptcy Code section 363(f)(2).

CC.    Interests, if any, will attach solely to the proceeds of the Sale of the Acquired Assets against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority that such Interests now have against the Acquired Assets or their proceeds, subject to any rights, claims and defenses that the Debtor, the Trustee or the Debtor's estate may possess with respect thereto.

DD.    The Trustee has made a good and sufficient showing that the Sale must close as soon as possible.

10

EE.    The relief granted herein is in the best interests of the Estate, all creditors and other parties in interest.

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.    The Motion is granted, as provided herein.

2.    Any and all objections to the Motion or to the relief requested therein, if any, that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights, if any, included in such objections, are overruled in all respects on the merits.

3.    To the extent of any inconsistency between this Order and the APA, the terms of this Order shall control.

4.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014.   To the extent any of the findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

5.    The Trustee is hereby authorized to sell all of the estate's right, title and interest, in and to the Acquired Assets to the Buyer for the amount of $1,705,000.00, plus such other consideration identified in the APA.

6.    The Sale of the Acquired Assets to Buyer is hereby approved and without further order or notice, the Trustee is hereby authorized to take all other and further actions as may be reasonably necessary to implement the Sale, including but not limited to (a) executing

resolutions authorizing the Debtor to assume and assign the Debtor Assumed Leases, and the Subsidiaries to assign their respective Subsidiary Assumed Leases to the Buyer or its Designee, (b) entering into agreements that effectuate the assumption and assignment of the Debtor Assumed Leases to the Buyer or its Designee, and the assignment of the Subsidiary Assumed Leases, which shall then be assumed by the Buyer, and (c) using assets of the Debtor's estate to pay the Cure Amounts.

7.      The consideration provided to the Trustee and the estate in exchange for the Acquired Assets is fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

8.      The Sale of the Acquired Assets was negotiated by the Trustee in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the transactions contemplated by the APA shall not affect the validity and enforceability of the Sale of the Acquired Assets, unless such authorization is duly stayed pending such appeal.  The Buyer is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

9.      Pursuant to Bankruptcy Code sections 105(a) and 363(f), as of the Closing of the Sale of the Acquired Assets, the Buyer shall take title to and possession of the Acquired Assets free and clear of all Interests of any kind or nature whatsoever, with any such Interests to attach to the proceeds of the Sale that are ultimately attributable to the Acquired Assets, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority that such Interests now have against the Acquired Assets or their proceeds, subject to any rights, claims and defenses that the Debtor, the Trustee or the Estate, as applicable, may possess with respect thereto.

12

10.     Except as expressly permitted or otherwise specifically provided by the APA or this Order or by agreement with the Buyer, all person(s) holding Interests in or to the Acquired Assets arising under or out of, in connection with, or in any way relating to the Debtor, the Debtor's estate, the Subsidiaries or the Acquired Assets, prior to the transfer of the Acquired Assets to the Buyer or its Designee, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer or its Designee or their successors or assigns, their property, or the Acquired Assets, such person(s)' Interests, claims, rights of recoupment, or set-off in the Acquired Assets.

11.     If any person that has filed statements or other documents or agreements evidencing Interests in or to the Acquired Assets shall not have delivered to the Trustee prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, or any other documents necessary for the purpose of documenting the release of all Interests which the person has or may assert respecting the Acquired Assets, the Trustee is hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person with respect to the Acquired Assets.

12.     Pursuant to Bankruptcy Code sections 105(a) and 365, the Trustee is authorized to assume and assign to the Buyer each of the Debtor Assumed Leases upon the Closing of the transactions contemplated by the APA. The Trustee has met all requirements of Bankruptcy Code section 365(b) for each Debtor Assumed Lease. The Buyer has demonstrated adequate assurance of future performance under the Debtor Assumed Leases within the meaning of Bankruptcy Code sections 365(b)(1)(C), 365(f)(2)(B), and for the reasons set forth on the record of the Sale Hearing.

13

13.    Pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized to cause each Subsidiary to assign to the Buyer or its Designee, and the Buyer or its Designee shall assume each of the Subsidiary Assumed Leases upon the Closing of the transactions contemplated by the APA, which Subsidiary Assumed Leases shall be fully enforceable against the Buyer or its Designee after the Closing (as such term is defined in the APA) notwithstanding anything to contrary contained in this Order.

14.    Except as otherwise provided herein, no monetary or non-monetary defaults exist in the Debtor's or Subsidiaries' performance under the Assumed Leases as of the date of this Order other than the failure to pay the Cure Amounts or defaults that are not required to be cured as contemplated in Bankruptcy Code section 365(b)(1)(A) or are not required to be cured pursuant to specific agreement among the Trustee, Buyer and applicable Lease Counterparty. Except as otherwise specifically provided in this Order, or as specifically agreed to with a Lease Counterparty, the Cure Amounts are fixed in the amounts set forth on Exhibit "B" hereto. Upon payment of the Cure Amount to a Lease Counterparty, such Lease Counterparty shall be barred from asserting any addition Cure Amounts or other claims with respect to its Assumed Lease against the Trustee, the Debtor's estate or the Subsidiaries.

15.    To the extent that any Lease Counterparty to an Assumed Lease did not timely object, such Lease counterparty is deemed to have consented to (a) the assumption and assignment of such Debtor Assumed Lease to the Buyer or its Designee or the assignment of such Subsidiary Assumed Lease to the Buyer or its Designee pursuant to the terms of this Order; and (b) the proposed Cure Amounts.

16.    The assumption and assignment of the Debtor Assumed Leases and the assignment of the Subsidiary Assumed Leases shall be deemed to have occurred as of the

14

Closing.  Upon the Closing, the Buyer or its Designee shall be deemed to be substituted as the new tenant under each of the Debtor Assumed Leases and each of the Subsidiary Assumed Leases, and the Trustee, the Debtor's estate and each Subsidiary shall be released from any liability under the Assumed Leases except for the obligation of the Debtor's estate to pay the Cure Amount.

17.    The assumption and assignment of the Debtor Assumed Leases and the assignment and assumption of the Subsidiary Assumed Leases are contingent upon the Closing and the assignment of the Assumed Leases to the Buyer or its Designee.  If the Closing is not completed by December 1, 2015, the Trustee may, in her discretion, extend the Closing to no later than December 8, 2015; provided that Buyer or its Designee pays all rent, additional rent and all other costs associated with the Assumed Leases for the month of December, with such payment to be made to the Trustee no later than December 3, 2015 at noon E.S.T.

18.    Notwithstanding any provision in the Assumed Leases, including a covenant of continuous operation or a "go dark" provision, the Buyer shall not be required to operate its business from the leased premises for a reasonable period of time after the Closing, but in no event more than 60 days, in order to perform alterations and remodeling which shall be done in accordance with the terms of each Assumed Lease.

19.    Except as otherwise provided on the record of the Sale Hearing, each Lease Counterparty to an Assumed Lease is forever barred, estopped, and permanently enjoined from asserting against the Buyer or Debtor's estate or any Subsidiary or the property of the Debtor's estate or any Subsidiary (i) any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-

15

control in such Assumed Leases or any purported written or oral modification to the Assumed

Leases; or (ii) any claim, counterclaim, defense, breach, default, condition, setoff or other claim

asserted or capable of being asserted against the Debtor, its estate or the Subsidiaries existing as

of the Closing or arising by reason of the Closing.

20.      The Buyer is directed to replace the security deposits under the Assumed Leases

in the amount set forth in the Assumed Leases and the Additional Security at or prior to the

Closing as such term is defined in the APA.

21.      Each Lease Counterparty to an Assumed Lease (whether a Debtor Assumed Lease

or a Subsidiary Assumed Lease) shall remit to the Trustee an amount equal to the security

deposit set forth on Exhibit "B" hereto within three (3) business days after receipt of the amounts

set forth in paragraph 20 above from Buyer.

22.      For the reasons set forth on the record of the Sale Hearing, the requirements and

conditions under Bankruptcy Code sections 105, 363 and 365 for the assumption and assignment

of the Debtor Assumed Leases and the assignment and assumption of the Subsidiary Assumed

Leases have been satisfied.  As of the Closing, the Sale will result in a legal, valid, enforceable

and effective sale and transfer of the Acquired Assets, including the Debtor Assumed Leases and

Subsidiary Assumed Leases, to the Buyer or its Designee and shall vest the Buyer or its

Designee with title to such Acquired Assets, including the Assumed Leases, free and clear of all

Interests.  Landlords to the Subsidiary Assumed Leases have consented to the assignment and

assumption by Buyer or its Designee, and no other or further consents or approvals are required

to consummate the assignment of the Subsidiary Assumed Leases or for the Buyer or its

Designee to assume the Subsidiary Assumed Leases.

16

23.     To the extent the proceeds of the Sale are impressed with a PACA trust, the Cure

Amounts, or to the extent any security deposit amounts are paid by the estate, all such amounts

may be paid from such trust in accordance with the PACA Order and beneficiaries of the PACA

trust shall have no interest in any such amounts and shall not seek to recover any such amounts

from the Lease Counterparties that received them.  To the extent that any of the Acquired Assets

are impressed with the PACA Trust, that Trust will attach to the proceeds of the Sale and the

Buyer or its Designee and their successors and assigns will have no obligation for any amounts

which may be due to any PACA trust fund beneficiary and title to all Acquired Assets shall vest

in the Buyer or its Designee with title to such Acquired Assets, including Assumed Leases, free

and clear of any and all claims under the PACA Trust.

24.     Proceeds from the Sale in the amount of $350,000.00 shall be reserved in the

Trustee's account for this case for the beneficiaries of the PACA trust and such amounts will not

be disbursed until entry of a Order of this Court resolving the claims of the PACA trust

beneficiaries.  All rights of the PACA trust beneficiaries are reserved to amend their claims and

all rights of the Trustee and all parties in interest are reserved to object to such claims on any

grounds.

25.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective

immediately upon entry and the Trustee and the Buyer are authorized to close the Sale

immediately upon entry of this Order, notwithstanding any otherwise applicable waiting period.

26.     Except as otherwise provided in the APA, the Acquired Assets shall be sold,

transferred and delivered to Buyer on an "as is, where is" and "with all faults" basis and without

representations or warranties of any kind or nature.

17

27.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the Buyer and the Trustee without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the APA or modify the express terms of this Order.

28.    This Order is and shall be binding upon and govern the acts of all persons, including, without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages or deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

29.    Nothing herein shall be deemed to modify any letter agreement, subsequent lease amendment, or assignment and consent agreement respecting a Subsidiary Assumed Lease entered into by Buyer and a Lease Counterparty and to the extent of any inconsistence between this Order and the relevant letter agreement, subsequent lease amendment, or assignment and consent agreement, such agreement or amendment shall control as between the Buyer and the Lease Counterparty.

30.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the APA, related agreements, and all amendments thereto and any waivers and

consents thereunder.


Dated:  New York, New York
        November 24, 2015

                                    _____*s/ Robert E. Gerber*_____
                                    HONORABLE ROBERT E. GERBER
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

# ASSET PURCHASE AGREEMENT



EXECUTION COPY

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "**Agreement**"), made this 23rd day of November, 2015, is by and between **Jil Mazer-Marino**, not individually but as trustee for the chapter 7 bankruptcy estate of **Organic Avenue, LLC**, a New York limited liability company and **Arrow Equity Fund LLC** a New Jersey limited liability company having a principal place of business at 150 Airport Road, Lakewood, New Jersey 08701 ("**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, on October 15, 2015 (the "**Petition Date**"), Organic Avenue, LLC ("**Organic Avenue**" or the "**Debtor**") filed a voluntary petition for relief under chapter 7, title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Case No. 15-12787 (REG);

**WHEREAS**, on October 16, 2015 Jil Mazer-Marino (the "**Trustee**" or "**Seller**"), was appointed as interim chapter 7 Trustee for the Debtor and has since qualified as permanent chapter 7 trustee for the Debtor;

**WHEREAS,** an order establishing notice, bidding and auction procedures (the "**Bid Procedures Order**") was entered by the Bankruptcy Court on **November 5, 2015**;

**WHEREAS**, Buyer desires to purchase all of the assets of the Debtor's estate from the Trustee, on the terms and conditions set forth below, with the intention of operating retail stores under the name "Organic Avenue" that sell juice and yogurt and related products produced by Norman's Dairy, LLC d/b/a Norman's Dairy ("**Norman's Dairy**").

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## ARTICLE 1. PURCHASE AND SALE OF ASSETS

Section 1.    Sale of All Assets. Subject to entry of the Sale Order (defined in Article 9, Section 2) and the terms and conditions of this Agreement, Seller agrees to sell, transfer and deliver to Buyer, and Buyer agrees to buy from Seller, all of Seller's right, title and interest in and to all existing assets of the Debtor (collectively, the "**Acquired Assets**"), including without limitation, all machinery and equipment, intellectual property, trade names, domain name, website, and customer lists, together with all of the non-residential real property leases set forth on Schedule 1 hereto (the "**Assumed Leases**"). Seller is not selling, transferring or delivering and Buyer is not buying the Debtor's estate's cash, cash equivalents, the Debtor's estate's interests in any security deposits under its non-residential real property leases (including but not limited to the security deposits under the Assumed Leases), or any of the Debtor's estate's causes of action under chapter 5 of the Bankruptcy Code. Such assets are not Acquired Assets.

(a)    No Assumption of Liabilities. Buyer shall not assume and shall not be deemed liable for any of the Debtor's liabilities, claims, or taxes owed or accruing prior to the

Closing Date; provided however, that Buyer agrees to pay any Transaction Taxes (defined in Article 6, Section 1).

        Section 2.      Retention of Liabilities.  Buyer is only responsible for debts and liabilities under the Acquired Assets arising on or after the Closing Date and Buyer shall not assume any other liability or obligation of the Debtor of whatever kind or nature, whether presently in existence or arising hereafter, including any tort claims, employment-related claims, and claims for successor liability.  All such debts and liabilities of the Debtor accruing or arising prior to the Closing Date shall be retained by and remain the sole responsibilities of the Debtor's estate.

        Section 3.      Cure Costs.  The Debtor's estate shall be responsible for satisfying all cure costs that are agreed to by the Trustee and the landlord or found by the Court as necessary for the Debtor's estate to assume and assign the Assumed Leases.  Such cure costs shall be paid by the Seller at or promptly after the Closing, but in no event later than five (5) business days after the Purchase Price clears the Trustee's bank account.

        Section 4.      Security Deposits.  Buyer or its designee shall deliver a security deposit to the landlord for each Assumed Lease in the amount set forth in such Assumed Lease, determined by the Court, or otherwise agreed to by such landlord and Buyer.  Such security deposits shall be paid by the Buyer or its designee at or promptly after the Closing, but in no event later than five (5) business days after the Closing.

        Section 5.      Designation of Assignees.  The Buyer may designate one or more separate limited liability companies that are wholly owned by the Buyer as the specific assignee(s) of the Assumed Leases so long as such designated limited liability companies replenish the security deposits required under each of the Assumed Leases.  Alternatively, the Buyer, with the consent of the applicable landlords, may designate one or more separate limited liability companies affiliated with the Buyer and Norman's Dairy as the specific assignees of the Assumed Leases.

        Section 6.      Adequate Assurances.  The Buyer and the owners of Norman's Dairy shall provide additional financial information and otherwise cooperate with the Trustee in providing adequate assurances of future performance with respect to the Assumed Leases, it being understood and agreed, however, that the Trustee shall not be permitted to remove any of the designated Assumed Leases from Schedule 1 regardless of whether the amount of the cure costs are more than anticipated or a particular landlord opposes assumption and assignment of the Assumed Lease(s); provided, however, the Buyer acknowledges that the Trustee cannot assign the Assumed Leases to Buyer absent Bankruptcy Court approval and Bankruptcy Court approval may be withheld if Buyer does not provide adequate assurance of future performance (which may include supplemental security deposits).  Buyer, in its sole discretion may opt not to provide additional adequate assurance in the form of providing supplemental security deposits for any one or more Assumed Leases and, in such case, Seller, in her sole discretion, may pull such Assumed Lease from the Transaction or forego performance under this Agreement.

        Section 7.      461-469 Amsterdam Avenue.  The landlord for the Assumed Lease for premises located at 461-469 Amsterdam Avenue served a Notice of Termination that is purportedly effective as of November 4, 2015.  On November 4, 2015, the Bankruptcy Court entered an order that stayed any landlord from taking any action to terminate the Assumed

2

Leases. Accordingly, the Trustee believes the Bankruptcy Court order stayed the effectiveness of the Notice of Termination and that Assumed Lease is eligible to be assumed and assigned to Buyer. However, the Trustee reserves the right to remove this lease from the list of Assumed Leases if the Court determines that such lease is terminated and, in such event, the Purchase Price shall be reduced by $67,500.00, but this Agreement shall otherwise remain in full force and effect.

## ARTICLE 2. CONSIDERATION

Section 1.    Consideration. The aggregate consideration for the sale and transfer of the Acquired Assets is (a) ONE MILLION SEVEN HUNDRED AND FIVE THOUSAND dollars ($1,705,000) in cash (the "**Purchase Price**"), which shall be payable and deliverable on Closing in accordance with Article 3, Section 3 herein; and (b) the assumption by Buyer of the Acquired Assets.

Section 2.    Deposit. Concurrently with the execution and delivery of this Agreement, Buyer shall, by wire transfer of immediately available funds, transfer to the Seller an aggregate amount equal to ONE HUNDRED SEVENTY THOUSAND AND FIVE HUNDRED dollars ($170,500), representing ten percent (10%) of the Purchase Price (such amount, together with all interest earned thereon, if any, the "**Deposit**"), to be held by the Seller in a separate segregated account in accordance with the terms and provisions of this Agreement. If this Agreement is terminated without the Closing occurring, the Deposit shall be disbursed in accordance with Article 8, Section 2. If the Closing occurs, the Deposit shall be applied (with interest if any) to the Purchase Price. Concurrently with the execution and delivery of this Agreement, Buyer shall transfer to its counsel an amount equal to $1,534,500 which shall not be released by counsel until the conclusion of the hearing to obtain Bankruptcy Court approval of this Agreement. If this Agreement is approved by the Bankruptcy Court, counsel shall retain such funds until the Closing.

## ARTICLE 3. CLOSING AND DELIVERIES

Section 1.    Closing. The consummation of the transactions contemplated hereby (the "**Closing**") shall take place, within three (3) Business Days after entry of the Sale Order, or as otherwise may be agreed to by the parties hereto (the "**Closing Date**"), at the offices of Sellers' counsel or at a place otherwise agreed upon by the parties, time being of the essence.

Section 2.    Seller's Deliveries. At the Closing, Seller shall deliver to Buyer:

(a)    bills of sale, endorsements, assignments and other instruments of transfer and conveyance necessary to effect the sale, transfer, and assignment of the Acquired Assets to Buyer that are consistent with the terms of this Agreement and reasonably satisfactory in form and substance to counsel for Buyer;

(b)    possession of the Acquired Assets (to the extent physically deliverable); and

(c)    a copy of the Sale Order as entered on the docket of the Debtor's bankruptcy case.

3

Section 3.    <u>Buyer's Deliveries</u>.  At the Closing:

(a)    Buyer shall pay to Seller the Purchase Price (less the Deposit) by wire transfer of immediately available funds in accordance with wire instructions provided by Seller.

Section 4.    <u>Assumption and Assignment Agreements</u>.  The parties shall execute and deliver to each other assumption and assignment agreements providing for the Trustee to assume and assign each Assumed Lease to the Buyer or its designee and providing for the Buyer or its designee to perform all obligations under such Assumed Lease after the Closing.  Such agreement shall be in form and substance reasonably acceptable to the Buyer, Seller and their respective counsel.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES

Section 1.    <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Buyer as follows:

(a)    <u>Authorization and Validity</u>.  Seller has all power and authority to enter into this Agreement and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  Subject to the Bankruptcy Court's entry of the Sale Order, the execution and delivery of this Agreement and the performance of the obligations hereunder have been duly authorized by all necessary corporate action of Seller, and no other action on the part of Seller is necessary to authorize such execution, delivery and performance.  This Agreement has been duly executed by Seller and, subject to Bankruptcy Court approval, constitutes Seller's valid and binding obligations, enforceable against Seller in accordance with the terms hereof.  Notwithstanding the foregoing, the tenants under certain of the Assumed Leases are wholly owned limited liability companies of the Debtor (the "**Debtor Subsidiaries**").  In order for the Seller to assume and assign those Assumed Leases, the Trustee may be required to commence bankruptcy cases for such Debtor Subsidiaries or obtain other relief from the Bankruptcy Court that may be included in the Sale Order or in a separate order or orders of the Bankruptcy Court.

Section 2.    <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller as follows:

(a)    <u>Corporate Organization</u>.  Buyer is a New Jersey limited liability company, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has all requisite power and authority to own its properties and assets.

(b)    <u>Authorization and Validity of Agreement</u>.  Buyer has all requisite power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been duly authorized by all necessary action by the board of directors (or equivalent) of Buyer, and no other action on the part of Buyer is necessary to authorize such execution, delivery and performance.  This Agreement has been duly executed by Buyer and constitutes the valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms.

4

(c)    No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement does not and will not violate or conflict with any provision of the organizational documents of Buyer and does not and will not violate any provision of law, or any order applicable to Buyer, nor will it result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(d)    Consents and Approvals.  The execution, delivery and performance of this Agreement by Buyer does not and will not require the consent or approval of, or filing with, any government or any other Person except (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a Material Adverse Effect on the ability of Buyer to consummate the transactions contemplated hereby.

(e)    Investigation by Buyer.  Buyer has conducted its own independent review and analysis of the Acquired Assets.  Buyer has conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Debtor's bankruptcy case.  In entering into this Agreement, Buyer has relied upon its own investigation and analysis as well as Seller's representations and warranties contained in Article 4.1 (which are subject to the limitations and restrictions contained in this Agreement), and Buyer (i) acknowledges that neither Seller, the Debtor, nor any of their respective Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in this Agreement (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by law, that none of Seller, the Debtor, nor their respective Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), except for Seller's representations and warranties contained in this Agreement and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

(f)    Capitalization.  Buyer represents that it will be adequately capitalized to purchase the Acquired Assets through contributions from Mark Tress or his entities, and the principals of Norman's Dairy (Mort Rosenbloom), which is engaged in the business of manufacturing kosher yogurt products.    Additional information can be found at http://www.normansdairy.com.

Section 3.    Warranties Exclusive.  The parties acknowledge that the representations and warranties contained in Article 4 are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed except for the Trustee's obligation to deliver the Acquired Assets, including the Assumed Leases, free and clear of all claims, liens, encumbrances, and interests.  Without limiting the foregoing, Buyer acknowledges

that the Acquired Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT NEITHER SELLER, THE DEBTOR NOR THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE ANY REPRESENTATION OR WARRANTY CONCERNING (I) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (II) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS, (III) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS, (IV) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY FEDERAL OR OTHER LAWS, OR (V) THE LIKLIHOOD THAT A SALE ORDER IN FORM ACCEPTABLE TO THE BUYER WILL BE ENTERED.

Section 4.    Survival of Representations and Warranties. None of the representations or warranties of Seller or Buyer set forth in this Agreement or in any certificate delivered hereto shall survive the Closing. The parties hereto agree that the representations and warranties of Seller contained in this Agreement shall terminate upon the Closing or upon the earlier termination of this Agreement pursuant to Article 8 and neither Seller nor Buyer shall have any liability for any breach thereof from and after such termination.

## ARTICLE 5. COVENANTS AND OTHER AGREEMENTS

Section 1.    Covenants of Seller and Buyer.

(a)    Covenants of Seller.

(i)    Approvals. Seller shall use all commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective in an expeditious manner the transactions contemplated hereby by obtaining Bankruptcy Court approval of the Agreement pursuant to 11 U.S.C. §§ 363 and 365, including protection of the Buyer as a good faith purchaser.

(b)    Covenants of Buyer.

(i)    Personally Identifiable Information. In connection with its purchase of the Acquired Assets which contain personally identifiable information within the meaning of section 363(b) of the Bankruptcy Code, Buyer agrees to: (A) assume all obligations set forth in the Debtor's privacy policy, if any, as in effect as of the Petition Date; (B) to abide by all applicable laws and regulations with respect to such information; and (C) to take such additional reasonable actions as may be agreed between Seller and Buyer.

## ARTICLE 6. TAXES

Section 1.    Taxes Related to Purchase of Assets. All federal, state and local sales and transfer taxes, including, without limitation, all state and local taxes in connection with the

transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be paid by the Buyer.  Transaction Taxes do not include any tax in the nature of an income tax, including without limitation, any capital gains, franchise, excise, inheritance, estate, succession, or gift taxes.  Buyer and Seller agree to cooperate to minimize any such Transaction Taxes and to determine appropriate taxing authorities and amount of Transaction Taxes, if any, payable in connection with the transactions contemplated under this Agreement.  Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 2.    Cooperation on Tax Matters.

(a)    Buyer and Seller agree to furnish, or cause to be furnished to each other, (including the execution and delivery of appropriate powers of attorney) as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings as required by law relating to tax matters, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer to any governmental or regulatory inquiry relating to tax matters.

(b)    Buyer agrees to retain possession, at its own expense, accounting, business, financial and tax records and information, if any, (i) relating to the Acquired Assets that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets before the Closing Date, for a period of at least three (3) years from the Closing Date, and will give Seller (or Seller's designated successor) notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Buyer agrees that it will provide copies as reasonably requested to Seller, Seller's designated successor and their respective attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) of the books, records, documents and other information relating to the Acquired Assets as Seller or Seller's designated successor may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete the Debtor's bankruptcy case.

Section 3.    Allocation of Purchase Price and Purchase Price Allocation Forms.  The Purchase Price will be allocated among the Acquired Assets in accordance with the allocation of the Purchase Price (the "**Allocation**") in a mutually beneficial manner no later than one (1) business day prior to the Closing.  Any adjustments to the Purchase Price shall result in an adjustment to the Allocation in accordance with section 1060 of the Code and the Treasury Regulations thereunder.  The Allocation, as so adjusted, shall be binding on the parties for all purposes.  Seller and Buyer agree that the transaction will be treated principally as an asset acquisition for tax purposes.  Seller and Buyer will cooperate in filing with the Internal Revenue Service their respective Forms 8594, including any required amendments or supplements thereto, as provided for in section 1060 of the Code and the Treasury Regulations issued thereunder on a

basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed. Neither Seller, Seller's designated successor, nor Buyer shall, nor shall they permit their respective Affiliates to, take any position inconsistent with the Form 8594, as appropriately adjusted.

**ARTICLE 7.** CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

Section 1.    Conditions Precedent to Performance by Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in Article 7, Section 1(c)) may be waived by Seller in its sole discretion:

(a)    Representations and Warranties of Buyer. All representations and warranties made by Buyer in Article 4 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for inaccuracies that do not result in a Material Adverse Effect on Buyer's ability to perform its obligations hereunder.

(b)    Performance of the Obligations of Buyer. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date.

(c)    Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date and the Bankruptcy Court shall have jurisdiction to permit Seller to assume and assign the Debtor Subsidiary Assumed Leases.

(d)    No Violation of Orders. No preliminary or permanent injunction or other order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

Section 2.    Conditions Precedent to the Performance by Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in Article 7, Section 2(c)) may be waived by Buyer in its sole discretion:

(a)    Representations and Warranties of Seller. All representations and warranties made by Seller in Article 4, Section 1 shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for inaccuracies that do not result in a Material Adverse Effect.

(b)    Performance of the Obligations of Seller. Seller shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date.

(c)    Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, in form and substance satisfactory to Buyer, and no order staying, reversing,

modifying or amending the Sale Order shall be in effect on the Closing Date and there shall be no pending appeals of any Debtor Subsidiary Sale Orders.

(d)     No Violation of Orders.  No preliminary or permanent injunction or other order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby shall be in effect.

## ARTICLE 8.  TERMINATION

Section 1.     Termination.  This Agreement may be terminated at any time prior to the Closing Date by either Seller or Buyer as follows:

(a)     by either Seller or Buyer if the Closing shall not have occurred by December 11, 2015 (the "**Closing Deadline**");

(b)     by Seller if Buyer (x) is in material default, (y) is unwilling or unable to close by the Closing Deadline, or (z) shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement which would give rise to the failure of a condition set forth in Article 7, which breach cannot be or has not been cured within five (5) Business Days after the giving of written notice by Seller to Buyer specifying such breach in reasonable detail;

(c)     by Buyer if Seller (x) is in material default, (y) is unwilling or unable to close by the Closing Deadline, or (z) shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement which would give rise to the failure of a condition set forth in Article 7, which breach cannot be or has not been cured within five (5) Business Days after the giving of written notice by Buyer to Seller specifying such breach in reasonable detail; or

(d)     by the mutual written consent of Seller and Buyer.

Section 2.     Effect of Termination.  In the event of termination of this Agreement as provided in Article 8, Section 1(a) or (d), this Agreement shall forthwith become void and there shall be no liability on the part of either party other than for the return of the Deposit to Buyer with any interest thereon.  If the Agreement is terminated under Article 8, Section 1(b), Seller shall retain the Deposit and all interest thereon, if any, in addition to any other rights Seller may have against Buyer.  If the Agreement is terminated under Article 8, Section 1(c) Seller shall return the Deposit to Buyer and the return of the Deposit by Seller shall be Buyer's sole remedy in the event of a termination by Buyer.

## ARTICLE 9.  BANKRUPTCY COURT MATTERS

Section 1.     Bankruptcy Code 363(b) and (f).  The sale contemplated by this Agreement is to be made in accordance with the provisions of Bankruptcy Code sections 363(b) and (f), and 365 with the Acquired Assets being sold free and clear of all liens, claims, interests and encumbrances of whatever kind or nature (the "**Interests**"), with such Interests, if any to attach to the net proceeds of sale and with all defaults under the Assumed Leases to be cured by Seller to the extent required by Bankruptcy Code section 365(b)(1)(A).

Section 2.    Sale Order.  Buyer acknowledges that this Agreement and the transactions contemplated herein are subject to entry of an order or orders approving this Agreement and authorizing the sale of the Acquired Assets free and clear of all Interests (the "**Sale Order**") and this Agreement is of no force or effect as to Seller prior to entry of the Sale Order.  As used herein, the term Sale Order shall include any orders entered in any bankruptcy cases commenced on behalf of the Debtor Subsidiaries that approve the assumption and assignment of an Assumed Lease (each one a "**Debtor Subsidiary Sale Order**").  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist Seller in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under section 363(m) or any other section of the Bankruptcy Code, that landlords under the Assumed Leases have adequate assurance of future performance by the Buyer or its designee, and that the Purchase Price was not controlled by an agreement in violation of section 363(n) or any other section of the Bankruptcy Code.  The Sale Order proposed by Seller to the Bankruptcy Court shall provide that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court notwithstanding rule 6004(d) of the Federal Rules of Bankruptcy Procedure and that the Buyer is a good faith purchaser under Bankruptcy Code section 363(m). The Sale Order shall also provide that the Trustee is authorized to assume and assign the Assumed Leases to the Buyer or its designee, such assumption and assignment is valid and enforceable, and the landlords for such Assumed Leases shall not assert defenses, rights of setoff or counterclaims against the Buyer or its designee based on facts arising prior to the Closing Date.

Section 3.    Break-up Fee.  In consideration of being the stalking horse bidder, Buyer shall be entitled to a Breakup Fee in the amount of Fifty Thousand Dollars ($50,000.00) (the "**Break Up Fee**") as set forth herein.  Buyer shall receive the Break Up Fee if the Seller closes on one or more alternative transactions that results in the sale of the Acquired Assets to a buyer or buyers other than the Buyer.  The Break-up Fee shall constitute an allowed administrative expense claim pursuant to §503(b) of the Bankruptcy Code, and shall be payable to the Buyer from the proceeds of any alternative sale transaction(s).  If Buyer is the Successful Bidder (as defined in the bid procedures approved by the Bid Procedures Order) as a result of submitting additional bid(s) at Seller's auction of the Acquired Assets that increases the Purchase Price, then the Break Up Fee shall be deemed a credit against the final Purchase Price.

Section 4.    Modified Bid Procedures.  Notwithstanding the Bid Procedures Order, the initial overbid of any Qualified Bidder bidding on the Acquired Assets in the aggregate shall be $1,700,000 with bidding thereafter to proceed in increments of $20,000 or more.

Section 5.    No Carve Out of Assets.  Buyer acknowledges that the Trustee is entertaining bids for the individual assets and leases and that a combination of such bids may be deemed by the Trustee to be the highest and otherwise best bids for the Acquired Assets.  The Trustee agrees that she shall not designate such bids as the highest or other best bids for the Acquired Assets unless the aggregate consideration to be received by the Trustee exceeds the Purchase Price herein; provided however, that the Trustee may designate any one or all of such bids as Back –Up Bids, as defined in the Bid Procedures approved by the Bid Procedures Order. Under no circumstances shall the Trustee require the Buyer to perform under this Agreement if

the Trustee carves out assets from the total pool of Acquired Assets covered by this Agreement in order to sell them in an alternative transaction.

## ARTICLE 10. MISCELLANEOUS

Section 1.    Successors and Assigns.  Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, specifically including, without limitation, the designated assignee of Seller.

Section 2.    Governing Law; Jurisdiction.    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by Federal Law.  The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters or disputes arising under or in connection with the Agreement, and consent to the exclusive personal and subject matter jurisdiction of, the Bankruptcy Court.

Section 3.    Expenses.  Each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated, subject to Article 9.  Buyer shall pay the cost of all fees, costs, and expenses associated with recording any assignment of the Acquired Assets.

Section 4.    Broker's and Finder's Fees.  Each of the parties represent and warrant that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement except the professionals retained by the Trustee pursuant to Court order.

Section 5.    Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 6.    Notices.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission, if prior to 3:00 p.m. on a Business day, and otherwise on the next Business Day; (iii) on the Business Day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service providing for delivery on such Business Day and

11

the procuring of a signed receipt; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

> If to Seller:
>
> > Jil Mazer-Marino, Chapter 7 Trustee
> > c/o Meyer, Suozzi, Engish & Klein, P.C.
> > 990 Stewart Avenue
> > P.O. Box 9194
> > Garden City, New York 11530-9194
> > Facsimile: 516-741-6706

> If to Buyer:
>
> > Arrow Equity Fund LLC
> > c/o Mark Tress
> > 150 Airport Road, Suite 900
> > Lakewood, New Jersey 08701

> With a copy to:
>
> > Kevin J. Nash, Esq.
> > Goldberg Weprin Finkel Goldstein LLP
> > 1501 Broadway, 22nd Floor
> > New York, New York 10036

(b)    Any party may change its address for the purpose of this Article 10, Section 6 by giving the other party written notice of its new address in the manner set forth above.

Section 7.    Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 8.    Entire Agreement.  This Agreement contains the entire understanding between the parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

Section 9.    <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller, Seller's designated successor and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller, Seller's designated successor or Buyer.  This Agreement is not intended to nor shall it give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 10.    <u>Headings, Interpretation, Gender</u>.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation."  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Buyer or Seller, whether under any rule of construction or otherwise.  No party to this Agreement shall be considered the draftsman.  On the contrary, this Agreement has been reviewed, negotiated and accepted by all parties and their attorneys and shall be construed and interpreted according to the ordinary meaning of the words so as fairly to accomplish the purposes and intentions of all the parties.  The captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  All references in this Agreement to "Section" or "Article" shall be deemed to be references to a Section or Article of this Agreement.  All references to "herein" or "hereof" or "hereunder" and similar phrases shall be broadly construed to refer to the entire Agreement and not merely to the specific clause, section, or article.

Section 11.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.  Delivery of an executed counterpart to this Agreement by facsimile or .pdf shall have the same force and effect as delivery of an original executed counterpart of this Agreement.

Section 12.    <u>Further Action</u>.  Pending the Closing, the parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law as may be consistent with the terms of this Agreement, or required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement, including without limitation the transfer and assignment of the Acquired Assets.

**ARTICLE 11. DEFINITIONS**

Section 1.    <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms which are not otherwise defined above, shall have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Material Adverse Effect" means a state of facts, event, change or effect that results in a material adverse effect on the value of the Acquired Assets or Assumed Leases taken as a whole and considering the reasonable prospects of monetizing the full value of the Acquired Assets, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes in economic, regulatory or political conditions generally; or (B) any hostilities, acts of war, military actions, sabotage or terrorism.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any taxes (including estimated taxes).

*[Signatures are on the following page.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

Jil Mazer-Marino, Chapter 7 Trustee for Organic Avenue, LLC., as Seller

By: ___/_____
    Name: Jil Mazer-Marino
    Title:  Chapter 7 Trustee

Arrow Equity Fund LLC, as Buyer

By: _____
    Name: ~~Mark Tress~~ Chris Anci
    Title: ~~Member~~ Authorized Signatory

15

# SCHEDULES

Schedule 1 – Assumed Leases

| Location | Address | City | State |
|---|---|---|---|
| Bleecker | 640 Broadway (62 Bleecker Street) | New York | NY |
| Bryant Park | 1065 Avenue of the Americas (5 Bryant Park) | New York | NY |
| Upper West Side | 461-469 Amsterdam Avenue (@82nd Street) | New York | NY |
| Midtown East | 649 Lexington Ave (136 E. 55th Street) | New York | NY |
| Chelsea | 261 West 21st Street (216 8th Avenue) | New York | NY |
| Park Ave. South | 254 Park Avenue South (@21st Street) | New York | NY |
| Hudson | 515 Hudson Street | New York | NY |
| 206 East 86 St / Upper East Side II | 206 East 86th Street | New York | NY |
| LIC-1 | 43-46 10th St | Long Island City | NY |
| LIC-2 | 43-37 9th St | Long Island City | NY |
| LIC-3 | 43-43 9th St | Long Island City | NY |
| LIC-4 | 10-01 45th Road | Long Island City | NY |

16

**EXHIBIT B**

**SCHEDULE OF CURE AMOUNTS AND SECURITY DEPOSITS**

**EXHIBIT B**

**SCHEDULE OF CURE AMOUNTS AND SECURITY DEPOSITS**

| Location of Premises | Tenant | Name and address of Lease Counterparties | Cure Amount As of November 30, 2015 | Security Deposit |
|---|---|---|---|---|
| 206 East 86th Street, New York, New York a/k/a 205 East 85th St, New York, New York | Organic Avenue LLC | Bar-Mar Associates c/o Howard Grun, Esq. Kaufman Friedman Plotnicki & Grun, LLP 300 East 42nd Street - 8th Floor New York, NY 10017 Tel: (212) 687-1700 Email: hgrun@kfpgllp.com | $110,110.38 | $158,862.50 |
| 10-01 45th Road, Long Island City, New York | Organic Avenue LLC | DH Vernon LLC c/o Jeffrey C. Chancas Borah Goldstein, Altschuler, Nahins & Goidel, P.C. 377 Broadway, 6th Floor New York, New York 10013 Email: JChancas@borahgoldstein.com | $55,607.41 | $46,666.68 |
| 43-46 10th Street, Long Island City, New York | Organic Avenue LLC | Schuman 43-46 10th Street LLC 36-04 Skillman Avenue, Long Island City, NY 11101  c/o Frederick E. Schmidt, Jr. Cozen O'Connor 277 Park Avenue New York, New York 10172 Email: eschmidt@cozen.com | $20,161.29 | $20,450.00 |

1

| Location of Premises | Tenant | Name and address of Lease Counterparties | Cure Amount As of November 30, 2015 | Security Deposit |
|---|---|---|---|---|
| 43-37 9th Street, Long Island City, New York | Organic Avenue LLC | Schuman 43-50 10th Street LLC<br>36-04 Skillman Avenue<br>Long Island City, NY 11101<br><br>c/o Frederick E. Schmidt, Jr.<br>Cozen O'Connor<br>277 Park Avenue<br>New York, New York 10172<br>Email: eschmidt@cozen.com | $27,502.51 | $28,768.47 |
| 43-43 9th Street, Long Island City, New York | Organic Avenue LLC | Schuman 43-50 10th Street LLC<br>36-04 Skillman Avenue<br>Long Island City, NY 11101<br><br>c/o Frederick E. Schmidt, Jr.<br>Cozen O'Connor<br>277 Park Avenue<br>New York, New York 10172<br>Email: eschmidt@cozen.com | $31,779.48 | $25,699.08 |
| 254 Park Avenue South, New York, New York | OA 254 Park Avenue South LLC | 254 Pas Trevi LLC<br>c/o Seth H. Lieberman, Esq.<br>Pryor Cashman<br>7 Times Square<br>New York, New York 10036<br>Email: slieberman@pryorcashman.com | $71,036.82 | $102,265.00 |

2

| Location of Premises | Tenant | Name and address of Lease Counterparties | Cure Amount As of November 30, 2015 | Security Deposit |
|---|---|---|---|---|
| 640 Broadway, New York, New York | Organic Avenue 640 LLC | 640 Broadway Owners LLC c/o Winhaven Management Services Corp. 590 Madison Avenue, 21st Floor New York, NY 10022<br><br>Dustin P. Branch Katten Muchin Rosenman LLP 2029 Century Park East, Suite 2600 Los Angeles, California 90067-3021 Email: dustin.branch@kattenlaw.com<br><br>and<br><br>575 Madison Avenue New York, New York 10022 | $27,100.00 | $0.00 |
| 261 West 21st Street, New York, New York | Organic Chelsea, LLC | Chelsea 8th Avenue, LLC 347 Fifth Avenue, 16th Fl., New York, NY 10016<br><br>c/o Jeffrey C. Chancas Borah Goldstein Altschuler Nahins & Goidel, P.C. 377 Broadway, 6th Floor New York, New York 10013 Email: jchancas@borahgoldstein.com | $88,372.29 | $100,000.00 |

3

| Location of Premises | Tenant | Name and address of Lease Counterparties | Cure Amount As of November 30, 2015 | Security Deposit |
|---|---|---|---|---|
| 515 Hudson Street, New York, New York | Organic Avenue WV LLC | Double Horse, Inc. c/o Pi Hui (Sylvia) Tsai, Esq. The Law Offices of Geng & Zhang 39-07 Prince Street, Suite 3E Flushing, New York 11354 Email: sylviatsai@law-gz.com info@law-gz.com | $64,008.70 | $64,000.00 |
| 5 Bryant Park a/k/a 1065 Avenue of the Americas, New York, New York | OA 1065 Avenue of the Americas | Trizechahn 1065 Avenue of the Americas Property Owner LLC c/o Michael Brownstein, Esq. BLANK ROME LLP The Chrysler Building 405 Lexington Avenue New York, New York 10174-0002 Email: mbrownstein@blankrome.com | $125,911.13 | $75,000.00 |
| 461 Amsterdam Avenue, New York, New York | Organic Avenue 82 LLC | 82GFGCLLC c/o A.R. Walker and Company, Inc. 225 West 80th Street, New York, NY 10024  c/o Jonathan L. Flaxer and Michael Weinstein Golenbock, Eiseman Assor Bell & Peskoe LLP 437 Madison Avenue New York, New York 10022 Email: jflaxer@golenbock.com mweinstein@golenbock.com | $46,550.31 | $78,877.40 |

4

| Location of Premises | Tenant | Name and address of Lease Counterparties | Cure Amount As of November 30, 2015 | Security Deposit |
|---|---|---|---|---|
| 649 Lexington Avenue, New York, New York | Organic Avenue 55 LLC | 136 East 55th St., Inc. c/o Jonathan L. Flaxer and Michael Weinstein Golenbock, Eiseman Assor Bell & Peskoe LLP 437 Madison Avenue New York, New York 10022 Email: jflaxer@golenbock.com mweinstein@golenbock.com | $46,367.55 | $40,000.00 |

5

I088875v.5